**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORP., | |
| Plaintiff, | |
| v. | CIVIL NO. 10-1623 (PG/MEL) |
| EMPRESAS CERROMONTE CORP., et al., | |
| Defendants. | |

**REPORT AND RECOMMENDATION**

On January 20, 2009, the now-defunct R-G Premier Bank of Puerto Rico ("R-G Premier Bank") filed the instant action for collection of monies and mortgage foreclosure in the Commonwealth of Puerto Rico Court of First Instance, Aguadilla Part, against, *inter alios*, defendant Empresas Cerromonte Corp. ("defendant" or "Cerromonte").[1]  (D.E. 1; 10-1).  The Federal Deposit Insurance Corporation ("FDIC" or "plaintiff") was appointed receiver of R-G Premier Bank on April 30, 2010, thereby succeeding to all of its rights and obligations.  (D.E. 1). On July 7, 2010, the FDIC as receiver for R-G Premier Bank removed the instant action pursuant to 28 U.S.C. § 1446 and 12 U.S.C. § 1819, the latter of which confers original federal jurisdiction over any case in which the FDIC is a party.  Id.

Pending before the court is plaintiff's motion for partial summary judgment with respect to defendant Cerromonte, along with defendant's response in opposition, plaintiff's reply, and defendant's surreply.  (D.E. 88; 102; 104; 116).  For the reasons set forth below, it is recommended that the pending motion be granted.

---

[1] The instant case has been stayed with respect to co-defendant Jesús Gabriel Castillo-Ortiz, but not Cerromonte. (D.E. 121; 123).  The claims against the remaining co-defendants have been dismissed without prejudice.  (D.E. 136).

I.     SUMMARY OF UNCONTESTED MATERIAL FACTS[2]

On October 4, 2007, R-G Premier Bank's Management Loan Committee approved a loan for Cerromonte.   Four days later, R-G Premier Bank and Cerromonte entered into a Loan and Security Agreement ("Loan Agreement") for "a non-revolving line of credit … of up to the aggregate principal amount of $8,727,000.00" to be used for the acquisition and development of certain real property.  (D.E. 88-3, at 8 § 2.1).  Under the Loan Agreement, interest would accrue on the principal sum until the date of maturity at a fluctuating annual interest rate of one hundred basis points in excess of the contractually-specified Prime Rate.   Interest would accrue and capitalize on a monthly basis through an interest reserve in the principal amount of $1,432,000 from the date of the loan until maturity or date of prepayment.  In the event of default, interest on the unpaid balance of the principal sum would accrue at the contractually-specified Default Rate. In the event that Cerromonte failed to make any payments on its due date, a late charge of two percent of the overdue payment would be charged.  (D.E. 88-2, ¶¶ 1–3; D.E. 102-1, at 1 ¶¶ 1–3, 6 ¶ 14; D.E. 104-1, ¶ 14).

The same day, Cerromonte executed a Promissory Note, agreeing to pay R-G Premier Bank the lesser of the principal sum of $8,727,000 or the aggregate unpaid principal amount of all Loan Advances made by R-G Premier Bank to Cerromonte.   Cerromonte also issued a Mortgage Note on October 8, 2007, to secure the payment and performance of all obligations under the Loan Agreement, payable to R-G Premier Bank or order, on demand, for the principal

---

[2] Local Rule 56 "structures the presentation of proof at summary judgment."   Goya Foods, Inc. v. Orion Distributors, Inc., Civ. No. 10-1168 (BJM), 2012 WL 1069191, at *1 (D.P.R. Mar. 29, 2012).  It "relieve[s] the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute," CMI Capital Market Inv. v. González Toro, 520 F.3d 58, 63 (1st Cir. 2008), by requiring "a party opposing a motion for summary judgment to accept, deny, or qualify each entry in the movant's statement of material facts paragraph by paragraph and to support any denials, qualifications, or new assertions by particularized citations to the record."  Cabán Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 6-7 (1st Cir. 2007).  In accordance with Local Rule 56(e), all proposed facts that are properly supported by record evidence and have not been successfully controverted or qualified by the opposing party have been deemed admitted.

amount of $7,927,000.  In the Mortgage Note, Cerromonte also agreed to pay $792,700 to cover all costs, expenses and attorneys' fees in the event that the debt had to be collected through the courts.  (D.E. 88-2, ¶¶ 4–6; D.E. 102-1, at 2 ¶¶ 4–6).

The Mortgage Note was secured by a first mortgage over real properties in the municipality of Aguadilla, with title in the name of Cerromonte.  The four properties accounted for, respectively, $6,341,600, $554,890, $554,890, and $475,620 of the principal amount of the Mortgage Note.  (D.E. 117-1, at 1; D.E. 117-2, at 1; D.E. 117-3, at 1; D.E. 117-4, at 1).  The real properties were grouped under one description on June 27, 2008, pending registry in the Property Registry.[3]  In the Loan Agreement, Cerromonte granted to R-G Premier Bank:

> a first security interest, together with all rights, interest, accretions and benefits flowing and deriving therefrom, … but not its obligations thereunder[,] in: (1) the Plans, (2) the Construction Contract, (3) the Bonds, (4) all insurance policies required under this Agreement and all proceeds from said insurance policies, and (5) all permits, approvals or endorsements issued by all Governmental Authorities in connection with the construction of the Improvements [on the aforementioned real property.]

(D.E. 88-3, at 47 § 10.02); (D.E. 88-2, ¶¶ 7–8, 12; D.E. 102-1, at 3 ¶¶ 7–8, 12).

Cerromonte filed a UCC Financing Statement with the Puerto Rico Department of State on October 8, 2007, which was to be filed and recorded in the Property Registry.  According to the Financing Statement, the items in which Cerromonte granted R-G Premier Bank a first security interest were to become fixtures.  Digno Emérito Estrada Rivera ("Estrada"), Edith Delia Colón Feliciano, and Emérito Estrada Rivera-Isuzu de Puerto Rico executed a Subordination Agreement, agreeing to subordinate their mortgages encumbering the aforementioned real property in favor of R-G Premier Bank.  (D.E. 88-2, ¶¶ 9–10; D.E. 102-1, at 3 ¶¶ 9–10).

---

[3] Plaintiff submitted certified translations of the property descriptions.  (D.E. 117-1; 117-2; 117-3; 117-4; 117-5).

As a condition of its loan to Cerromonte, R-G Premier Bank required that there be "[n]o further encumbrances over the mortgaged properties without the Bank's prior written consent, except to the subordination mortgage of $7,212,000." (D.E. 102-2, at 4); (see also D.E. 88-3, at 35 § 7.5; D.E. 102-3, at 9).  The term "subordination mortgage" refers to the aforementioned mortgages on the property to be purchased from seller Digno Emérita Estrada Rivera.  Pursuant to the Loan Agreement, Cerromonte was also prohibited, without R-G Premier Bank's "prior written consent," from "[c]reat[ing], incur[ring], assum[ing], permit[ting] or suffer[ing] to exist any Indebtedness [*sic*], except in the ordinary course of business" or "mak[ing] loans to any affiliate entity except in the ordinary course of business." (D.E. 88-3, at 34 & 35 § 7.8; see also D.E. 102-2, at 4; D.E. 102-3, at 9); (D.E. 102-1, at 5 ¶¶ 9–11; D.E. 104-1, ¶¶ 9–11).

R-G Premier Bank sent a letter ("Commitment Letter") on October 8, 2007, to Cerromonte stating that "R-G Premier Bank … has approved to provide a Secured Non-Revolving Line of Credit (Bridge loan facility) to Empresas Cerromonte Corp. … under the following terms and conditions outlined below and in schedule 'A' herein attached." (D.E. 102-2, at 1).  The purpose of the loan, as stated in the Commitment Letter, was to provide Cerromonte with a non-revolving line of credit in the amount of $8,727,000, including "$5,000,000, to complete the acquisition of a parcel of land of 15.0475 cuerdas and $800,000 to complete the acquisition of a parcel of land of 7.091 cuerdas for the development of a Shopping Center of approximately 129,000 sq ft, located at Ceiba Baja Ward Aguadilla P.R." Id.; (see also D.E. 102-3, at 1).  The purchase of the latter parcel of land was subject to the seller's fixing title issues on the property.  Legal expenses and financing costs constituted $908,000 and $1,519,000 of the funds.  R-G Premier Bank required that there be "[n]o change in loan purpose." (D.E. 102-2, at 4).  The loan was considered by R-G Premier Bank to be a "Bridge Loan." Id. at 2.

R-G Premier Bank required Cerromonte to repay the principal of the loan from a second loan—labeled "construction loan"—"in the amount of approximately $25,000,000."  Id.  According to the Loan Agreement, "[t]he principal of the Loan will be repaid with the proceeds of a permanent loan to be extended to [Cerromonte] at any time before or on the Maturity Date." (D.E. 88-3, at 9 § 2.4).  The Loan Agreement also provides that R-G Premier Bank "has the right of first refusal to provide the interim construction financing to the construction of improvements on the Property."  (D.E. 88-3, at 45–46 § 9.12); (D.E. 102-1, at 4–7 ¶¶ 1–2, 5–8, 12, 21; D.E. 104-1, ¶¶ 1–2, 5–8, 12, 21; D.E. 131, ¶ 5; D.E. 137, ¶ 2).

In order to obtain this loan, Cerromonte was required to provide "$500,000 of cash up-front equity at the closing."  (D.E. 102-3, at 2).  Cerromonte's financial statement for the period ending on December 31, 2006, indicates that it had $525,000 in retained earnings. Id. at 4.  In return, Cerromonte would receive funds to purchase the property, along with funds for the pre-development "soft costs." Id. at 1, 9.  Disbursements related to soft costs to prepare the property for development required R-G Premier Bank's approval.  (D.E. 102-1, at 6–7 ¶¶ 15, 19–20; D.E. 104-1, ¶¶ 15, 19–20).

On October 8, 2007, R-G Premier Bank paid Cerromonte a principal advance in the amount of $6,374,693.10, to which some payments were credited.  R-G Premier Bank continued to disburse money to Cerromonte up to the principal amount of $7,350,824.44.[4]  Once Cerromonte obtained the loan, it purchased the property and began to prepare it for development. (D.E. 88-2, ¶ 11; D.E. 102-1, at 3 ¶ 11, 7 ¶ 22; D.E. 104-1, ¶ 22).

On August 8, 2008, a meeting was held between Jesús Gabriel Castillo-Ortiz ("Castillo") and R-G Premier Bank employees.  (D.E. 131-1).  The "action plan" for the meeting states:

---

[4] Some of the disbursements were in the form of interest payments.  (See D.E. 88-15; D.E. 102-1, at 3 ¶ 11).

> We[5] will present an annual review for the loan in order to decrease the loan amount by $800,000 (funds originally approved but not used for the purchase of the second residential parcel) and to extend the maturity date for eight (8) additional months.   There's sufficient availability in the actual loan interest reserve to cover the interest payments during such eight (8) months ($697,005).
>
> During that time, will be giving sufficient time to the Borrower to provide all the lease contract to the tenants that will occupied [sic] the shopping building and to provide a construction contract with a bondable General Contractor, in order to start the construction of the project.

Id. at 3–4; (D.E. 131, ¶ 9; D.E. 137, ¶ 6).

On August 12, 2008, Pedro H. Díaz, Executive Vice President of Credit Risk Management at R-G Premier Bank, stated to the Board of Directors' Loan Committee that Estrada "tried to create certain degree of uncertainty with the transaction executed between RGPB and Empresas Cerromonte."  (D.E. 102-6, at 2).   The minutes of the meeting state that Estrada was "looking for any ways [sic] to halt plans the Bank might have to realize the FDMN supporting the credit facility available to Empresas Cerromonte and thus protect the existing Second DMN over the property, and which will adversely impact Mr. Estrada."[6]  Id.  Rafael Nin, the Chairman of the Board of Directors, recommended that "Cerromonte … be advised that the Bank would not entertain the financing of the shopping center."   Id. at 3.   The minutes also indicate that "[a]n additional six months period could be considered in order to allow Empresas Cerromonte to complete the sale of the property or obtain alternate financing elsewhere."  Id.  On August 28, 2008, Rafael Nin "advised that Mr. Emérito Estrada informed him that he would like to unwind the transaction of Empresas Cerromonte."  (D.E. 102-5, at 2); (D.E. 102-1, at 7–8 ¶¶ 25–26; D.E. 104-1, ¶¶ 25–26; D.E. 131, ¶ 7; D.E. 137, ¶ 4).

---

[5] The minutes indicate that "we" refers to Víctor M. Irizarry, Pedro Díaz, Luis Rivera, and Juan Crespo.
[6] Although the exhibit does not expressly clarify what the initials "FDMN" and "DMN" represent, it indicates that "mortgage notes negotiated by Empresas Cerromonte, Corp. was the center of the discussion."  (D.E. 102-6, at 2).

On October 7, 2008, R-G Premier Bank faxed a letter to Castillo stating that, "as we said at the meeting" held on September 24, 2008, R-G Premier Bank "cannot say in advance if it will make a commitment to award the interim construction loan for the shopping center." (D.E. 134-1, at 1). R-G Premier Bank never extended a construction loan or any other loan to develop the property to Cerromonte at any time on or before the maturity date. Cerromonte could not complete the development of its project, "standing to loose [*sic*] its initial $500,000.00 investment, the property and millions of dollars in lost earnings and profits." (D.E. 102-1, at 8 ¶ 28); (D.E. 102-1, at 7–8 ¶¶ 23, 28; D.E. 104-1, ¶¶ 23, 28; D.E. 131, ¶ 10; D.E. 137, ¶ 7).

The maturity date of the outstanding sums under the Loan Agreement was October 8, 2008. Cerromonte failed to pay the outstanding sums by said date. (D.E. 88-2, ¶ 13; D.E. 102-1, at 3 ¶ 13).

On April 30, 2010, the Office of the Commissioner of Financial Institutions of the Commonwealth of Puerto Rico closed R-G Premier Bank and appointed the Federal Deposit Insurance Corporation as receiver of the same. As of September 15, 2012, Cerromonte owed plaintiff the principal sum of $7,350,824.44, plus interest beginning September 8, 2008, of $1,229,152.08, default interest beginning October 8, 2008, of $586,841.09, late fees of $171,480.05, and liquidation fee of $792,700.00. After September 15, 2012, interest has continued to accrue at a daily rate of $853.58 and default interest at a daily rate of $408.38. Under the Loan Agreement, in the event of "continuance of Event of Default," overdue amounts "shall bear interest … at a rate per annum equal to 2% in excess of the then applicable interest rate" until full payment of the obligation. (D.E. 88-3, at 12 § 3.4); (D.E. 88-2, ¶¶ 14–16; D.E. 102-1, at 4 ¶¶ 14–16).

II.    LEGAL STANDARD

The purpose of summary judgment "is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required."  Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 794 (1st Cir. 1992).  Summary judgment is granted when the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "'A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party.  A fact is material if it has the potential of determining the outcome of the litigation.'"  Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 782 (1st Cir. 2011) (quoting Rodríguez-Rivera v. Federico Trilla Reg'l Hosp., 532 F.3d 28, 30 (1st Cir. 2008)).

In assessing a motion for summary judgment, the court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor."  Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990) (citations omitted).  There is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, [and] no room for the judge to superimpose his own ideas of probability and likelihood . . . ."  Greenburg v. P. R. Mar. Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987).  The court may, however, safely ignore "conclusory allegations, improbable inferences, and unsupported speculation."  Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (citations omitted).

III.    ANALYSIS

A.    *Exceptio non Adimpleti Contractus* **Doctrine**

In this case, it is undisputed that R-G Premier Bank extended a loan to Cerromonte in the principal sum of $8,727,000.  (D.E. 88-3, at 8 § 2.1).  Under the Loan Agreement, Cerromonte was obligated to repay the loan by the maturity date, October 8, 2008.  Id. §§ 1.1, 2.4.

Cerromonte does not appear to dispute that it has failed to fulfill its obligation to repay the loan. Rather, Cerromonte seeks to discharge its obligation under the doctrine of *exceptio non adimpleti contractus* implicit within the Puerto Rico Civil Code.  Under this doctrine, "once a party fails to fulfill its obligations under the contract, the other party is no longer bound to comply with its own obligations."  Waterproofing Sys., Inc. v. Hydro-Stop, Inc., Civ. No. 04-2218 (CCC/CVR), 2006 WL 6561411, at *13 (D.P.R. June 2, 2006); see also Dyno Nobel, Inc. v. Amotech Corp., 63 F. Supp. 2d 140, 151 n.4 (D.P.R. 1999).  This doctrine is available to a party as an affirmative defense where "the noncomplying party demands compliance from the other party."  Mora Dev. Corp. v. Sandin, 118 D.P.R. 733, 742, 18 P.R. Offic. Trans. 847, 857 (1987).

According to defendant, R-G Premier Bank failed to fulfill an obligation under its contract with Cerromonte.  In other words, R-G Premier Bank allegedly "violated the express bank-approved, recorded and written provisions of its Loan Agreement, including its Commitment Letter by not extending the promised financing during the term of Maturity of the loan, thus depriving Cerromonte of its right to repay the bridge loan with funds of the 'construction' or 'permanent' loan, as required under the Agreement."  (D.E. 102, at 8).  As a result, defendant argues, it cannot be expected to comply with its own obligations.

Defendant's counterclaims, including R-G Premier Bank's alleged breach of its commitment to lend $25,000,000 to Cerromonte, have been dismissed due to failure to exhaust its administrative remedies under the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183 (1989).  (See D.E. 138).  Nevertheless, defendant has also raised the argument that R-G Premier Bank has also failed to comply with its obligations as an affirmative defense.  (D.E. 10-4, at 3).  In other words, its argument is not that there was an oral commitment or implied agreement from R-G Premier Bank, but rather that

there was an express written obligation within the contract between R-G Premier Bank and Cerromonte with which the former failed to comply.   (See D.E. 102, at 8).   As such, the dismissal of defendant's counterclaims (see D.E. 138) does not prevent defendant from raising the aforementioned argument here.

According to Castillo's unsworn declaration under penalty of perjury, "Cerromonte was verbally told that the Bank would not honor its commitment to extend him a 'permanent' or 'construction' loan before the Maturity Date."   (D.E. 102-1, at 8 ¶ 27 & 9).   The Loan Agreement, however, provides that "[t]he Loan Documents constitute the complete agreements, and supersede any prior agreements, oral or written, between the parties, with respect to the subject matter hereof and thereof and may not be modified, altered or amended except by an agreement in writing signed by the Borrower and the Bank."   (D.E. 88-3, at 40 § 9.1).   Since the authenticity of the Loan Agreement has not been challenged and the aforementioned integration clause is not ambiguous, in order to establish that R-G Premier Bank indeed made a "commitment to extend … a 'permanent' or 'construction' loan before the Maturity Date," (D.E. 102-1, at 8 ¶ 27), Cerromonte must identify where in the Loan Documents or a subsequent "agreement in writing signed by the Borrower and the Bank" such a commitment was made. (D.E. 88-3, at 40 § 9.1); see P.R. Laws Ann. tit. 31, § 3471 ("If the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed.").   Additionally, 12 U.S.C. § 1823(e) and the D'Oench, Duhme doctrine prevent the assertion of unwritten agreements against the FDIC as receiver.   See 12 U.S.C. § 1823(e); see also, e.g., D'Oench, Duhme & Co. v. Fed. Deposit Ins. Corp., 315 U.S. 447 (1942); Ortiz-Hernández v. Westernbank of Puerto Rico, Civ. No. 10-1581 (JP), 2011 WL 1238907, at *2–*3 (D.P.R. Mar. 25, 2011); F.D.I.C. v. Monterrey, Inc., 847 F. Supp. 997, 1003

(D.P.R. 1994) ("[D]efenses not conforming with the requirements of § 1823(e) may not be asserted to defeat FDIC's interest on the $170,000.00 note."), aff'd, 45 F.3d 423 (1st Cir. 1995). Moreover, as discussed above, it is Cerromonte's contention that R-G Premier Bank "violated the express bank-approved, recorded and written provisions of its Loan Agreement."  (D.E. 102, at 8).

Cerromonte has identified several provisions within the Loan Agreement, the Commitment Letter, and the Loan Approval which it contends evince a commitment to extend additional financing beyond the "bridge loan."  Several of these provisions are negative covenants.  (See D.E. 102, at 3–4; D.E. 116, at 1; D.E. 131, at 2 ¶¶ 1–3).  One such negative covenant provides that Cerromonte shall not "[c]reate, incur, assume, permit or suffer to exist, any Lien upon the Property any of its property, assets, income or profits, whether now owned or held or hereafter acquired, except Liens created by the Collateral Documents and the second mortgages up to the total amount of $5,800,000 which will be subordinated."  (D.E. 88-3, at 35 § 7.5; see also D.E. 102-2, at 4; D.E. 102-3, at 9).  Two provisions indicate that Cerromonte shall not "[c]reate, incur, assume, permit or suffer to exist any Indebtedness [sic], except in the ordinary course of business," "make loans to any affiliate entity except in the ordinary course of business," or "[c]reate, incur, assume, permit or suffer to exist any Contingent Obligations." (D.E. 88-3, at 35 §§ 7.8, 7.9; see also D.E. 102-2, at 4; D.E. 102-3, at 9).  Cerromonte was also prohibited from "[c]hang[ing] Loan purpose."  (D.E. 88-3, at 36 § 7.13; see also D.E. 102-2, at 4; D.E. 102-3, at 9).  Defendant submits these provisions as evidence that "the loan … closed off other sources of financing the development of the shopping center."  (D.E. 116, at 1).

As an initial matter, with respect to these provisions, the Loan Agreement provides that Cerromonte "covenants and agrees that so long as the Loan remains outstanding and unpaid, in

whole or in part, or any other amount is owing to the Bank, *without the Bank's prior written consent* [it] will not directly or indirectly" engage in any of the aforementioned activities.[7]  (D.E. 88-3, at 34 (emphasis added)).  Moreover, contrary to defendant's assertion, these provisions do not imply that the Loan Agreement prohibited Cerromonte from obtaining financing from an entity other than R-G Premier Bank.  (See D.E. 102, at 3; D.E. 131, at 2 ¶¶ 1–3).  Nor does they state that Cerromonte promised to extend an additional loan for the construction of the shopping center, whether for $25,000,000 or any other amount.  The negative covenants simply subjected Cerromonte to the requirement that it receive R-G Premier Bank's prior written consent before engaging in any of the activities listed therein.

Defendant also points out that, pursuant to the Loan Agreement, "[t]he principal of the Loan will be repaid with the proceeds of a permanent loan to be extended to Borrower at any time before or on the Maturity Date."  (D.E. 88-3, at 9 § 2.4; D.E. 131, at 2 ¶ 4).  Similarly, the Commitment Letter provides that the principal of the loan would be repaid from a "construction loan in the amount of approximately $25,000,000."  (D.E. 102-2, at 2).  Defendant also points to the stated purpose of the loan which, according to the Commitment Letter, was "to complete the acquisition of a parcel of land of 15.0475 cuerdas and $800,000 to complete the acquisition of a parcel of land of 7.091 cuerdas for the development of a Shopping Center of approximately 129,000 sq ft, located at Ceiba Baja Ward Aguadilla P.R."  Id. at 1.  Cerromonte contends that these provisions constitute an express requirement of the loan in question that R-G Premier Bank

---

[7] Defendant cites the Commitment Letter and Loan Approval for certain negative covenants which, unlike the Loan Agreement, do not include the express caveat "without the Bank's prior written consent."  (See D.E. 102-2, at 4; D.E. 102-3, at 9).  Nevertheless, both the Commitment Letter and Loan Approval specify that these provisions are a description of what "[t]he Credit Facility *will* be subject to."  (D.E. 102-2, at 4; D.E. 102-3, at 9) (emphasis added).  Given that the Loan Agreement expressly includes the qualifier "without the Bank's prior written consent" as a preface to the negative covenants, (D.E. 88-3, at 34), the "contract language is so clear that reasonable people could not differ as to its intended meaning" and thus should be "decided as a matter of law."  City of Hope Nat. Med. Ctr. v. Seguros de Servicios de Salud de Puerto Rico, Inc., 983 F. Supp. 68, 76 (D.P.R. 1997), aff'd sub nom. City of Hope Nat. Med. Ctr. v. HealthPlus, Inc., 156 F.3d 223 (1st Cir. 1998).

extend a second loan of $25,000,000 to Cerromonte by October 8, 2008.  (See D.E. 102, at 3, 7–8).

Although it is clear that Cerromonte and R-G Premier Bank contemplated the existence of a separate loan, from whose proceeds the loan in question would be repaid, defendant's contention that the construction loan was to be extended by R-G Premier Bank itself is unsupported.  The Commitment Letter specifically indicates that R-G Premier Bank "ha[d] approved to provide a Secured Non-Revolving Line of Credit … in the amount of $8,727,000." (D.E. 102-2, at 1).  The letter does not state that R-G Premier Bank had approved to provide a line of credit in the amount of $25,000,000.  The purpose of the loan was "to complete the acquisition of a parcel of land … for the development of a Shopping Center."  Id.  The letter did not provide that the loan was directly for the purpose of constructing a shopping center.  It is uncontroverted that Cerromonte was expected to repay the loan principle from a second loan—an "interim construction loan in the amount of approximately $25,000,000."  Id. at 2. Nevertheless, this section of the letter does not represent that R-G Premier Bank would provide such a loan.

Cerromonte also points to a provision within the Loan Agreement specifying that R-G Premier Bank "has the right of first refusal to provide the interim construction financing to the construction of improvements on the Property."  (D.E. 88-3, at 45–46 § 9.12; D.E. 131, at 2–3 ¶¶ 5–6).  According to Cerromonte, "as of October 8, 2012 the Bank ha[d] not exercised it [sic] right of first refusal, preventing Cerromonte from obtaining financing elsewhere before the maturity date."  Id. at 4 ¶ 10.  As an initial matter, this unsupported assertion[8] appears to be in

---

[8] The only citation in support of this proposed fact is a letter dated October 7, 2008, from R-G Premier Bank to Castillo, stating in part that it "cannot say in advance if it will make a commitment to award the interim construction loan for the shopping center."  (D.E. 134-1, at 1).  The mere fact that R-G Premier Bank indicated that it would not

tension with evidence provided by Cerromonte that it "was verbally told that the Bank would not honor its commitment to extend [Castillo] a 'permanent' or 'construction' loan before the Maturity Date." (D.E. 102-1, at 8 ¶ 27 & 9).

Furthermore, this assertion reflects Cerromonte's erroneous interpretation of R-G Premier Bank's right of first refusal. Defendant contends that, "if Cerromonte wanted to obtain additional financing from other institutions to construct any 'improvements on the property' including the proposed Shopping Center, before the maturity date, Cerromonte was under the obligation to first to seek financing with RG Bank and, if 'refused', then seek financing elsewhere." (D.E. 131, at 2–3 ¶ 6).

The term "right of first refusal" is a term of art in contract law. A right of first refusal is "[a] potential buyer's contractual right to meet the terms of a third party's higher offer." Black's Law Dictionary (9th ed. 2009). "The phrase 'first refusal right' and terms of similar import have a well understood meaning in the business world which is that the owner of such a contract right is entitled to the opportunity to buy the subject property on the same terms contained in a bona fide offer from a third party acceptable to the owner of the goods." Bennett Veneer Factors, Inc. v. Brewer, 73 Wash. 2d 849, 856 (1968). As such, the existence of a right-of-first-refusal clause did not bar Cerromonte from seeking additional financing from an entity other than R-G Premier Bank; it granted R-G Premier Bank the right to offer said financing at the same terms as a third-party offer.

Moreover, the right-of-first-refusal clause does not constitute a guarantee that R-G Premier Bank would provide additional financing. Such a clause is an entitlement of the party, not an obligation. That R-G Premier Bank was contractually afforded "the right of first refusal

---

yet specify whether it would make a commitment to provide an additional loan does not imply that Cerromonte was prohibited from obtaining such a loan from an entity other than R-G Premier Bank.

to provide the interim construction financing to the construction of improvements on the Property," (D.E. 88-3, at 45–46 § 9.12), implies that it was permitted to decline to provide such financing.   In other words, "the very words 'right of first refusal' indicate that the entity exercising the right can refuse something offered."   Nygren v. Greater New York Mut. Ins. Co., No. 3:07cv00462 (DJS), 2009 WL 807470, at *7 (D. Conn. Mar. 27, 2009).

Black v. Fed. Deposit Ins. Corp., 640 F.2d 699, 701 (5th Cir. 1981), cited by plaintiff, is analogous to the instant case.   As here, "[t]he purpose of th[e] financing was to assist in the obligors' development of real estate."   Black, 640 F.2d at 700.   Neither the financial institution nor the FDIC ever expressly extended "construction financing" for the real property.   Id.   Like the Loan Agreement and its attendant documents in this case, "[n]one of the papers constituting the agreement committed [the financial institution] to make construction financing to these obligors."   Id. at 701.   The "'right of first refusal on all construction financing generated by this development' … plainly … only binds the obligors to give this right to [the financial institution] who may nevertheless refuse it."   Id.   As such, "under the written contract there was no breach because of failure to extend construction financing."   Id.

Defendant also submits minutes from an August 12, 2008, meeting of the R-G Premier Bank Board of Directors' Loan Committee, which indicate that:

> Following a discussion, regarding Empresas Cerromonte, Mr. Nin recommended to extend the maturity date based on the time covered by the remaining interest reserve balance.   Empresas Cerromonte should be advised that the Bank would not entertain the financing of the shopping center.   An additional six months period [*sic*] could be considered in order to allow Empresas Cerromonte to complete the sale of the property or obtain alternate financing elsewhere.

(D.E. 102-6, at 3).   Cerromonte interprets these minutes as indicating that the committee members "*considered* the possibility of 'allowing' [it] to 'obtain alternate financing elsewhere.'" (D.E. 131, at 3 ¶ 7 (emphasis in original)).   Similarly, Cerromote states that said minutes "show

15

that [it] was obliged to obtain financing through the RG Bank and that only the bank could allow it order to obtain 'alternate financing elsewhere' after it refused its financing." Id. at 3 ¶ 8.

Nevertheless, the minutes unambiguously indicate that it was considered at the meeting whether the loan's *maturity date* should be extended by "[a]n additional six months period … in order to allow Empresas Cerromonte to complete the sale of the property or obtain alternate financing elsewhere." (D.E. 102-6, at 3). Consequently, Cerromonte's interpretation of these minutes—that they indicate that the committee members were considering allowing Cerromonte to obtain alternate financing elsewhere—is not a reasonable or even plausible inference from the language and context of the minutes.

Moreover, even assuming for argument's sake that, at the meeting, the committee members discussed whether to allow Cerromonte to obtain alternate financing elsewhere, such fact would not constitute a material fact concerning whether Cerromonte actually was permitted or prohibited from obtaining said financing. Specifically, no material fact in controversy has yet been established that any of the Loan Documents, as defined in the Loan Agreement (see D.E. 88-3, at 5), contain a complete prohibition against Cerromonte's obtaining additional financing by a firm other than R-G Premier Bank.[9] No evidence has been submitted that the contract between Cerromonte and R-G Premier Bank had been subsequently "modified, altered or amended … by an agreement in writing signed by the Borrower and the Bank." (D.E. 88-3, at 40 § 9.1). Nor has Cerromonte presented any evidence that it sought additional financing from another firm but was prevented by R-G Premier Bank. Finally, no evidence has been presented to the court that Cerromonte attempted to obtain R-G Premier Bank's written consent to obtain such financing.

---

[9] As discussed above, the negative covenants in the Loan Agreement merely subject Cerromonte to the requirement of obtaining R-G Premier Bank's "prior written consent." (D.E. 88-3, at 34).

Cerromonte also asserts that R-G Premier Bank "never considered to allow said alternate financing elsewhere." (D.E. 131, at 3 ¶ 8). In support, defendant cites the right-of-first-refusal clause (D.E. 88-3, at 45 § 9.12) and the aforementioned excerpt from the minutes of the August 12, 2008, meeting (D.E. 102-6, at 3). Id. As discussed above, neither the right-of-first-refusal clause nor said minutes support the notion that R-G Premier Bank did not allow Cerromonte to obtain additional financing from an entity other than R-G Premier Bank.

Defendant also cites minutes from a meeting held on August 8, 2008, between Castillo and R-G Premier Bank employees. Id. at 3–4 ¶ 9 (citing D.E. 131-1, at 3–4). According to Cerromonte, at the meeting, R-G Premier Bank "exercised its rights to provide a construction loan and did not refuse to provide Cerromonte with such financing." Id. In support of this contention, Cerromonte argues that, because the document is titled "RG Loan Status Report: Acquisition, Development and Construction Loans," (D.E. 131-1, at 1), it implies that R-G Premier Bank "treated the loan to Cerromonte as 'Construction Loan.'" (D.E. 131, at 3 ¶ 9). Assuming for the sake of argument that R-G Premier Bank chose to treat Cerromonte's existing loan as a "construction loan," such fact would not establish that it extended a new loan or increased the principal of the existing loan.

According to the minutes, R-G Premier Bank "will be giving sufficient time to the Borrower to provide all the lease contract to the tenants that will occupied [sic] the shopping building and to provide a construction contract with a bondable General Contractor, in order to start the construction of the project." (D.E. 131-1, at 3–4). In other words, as Cerromonte states, "the Maturity Date of the notes would be extended" for said purposes. (D.E. 131, at 3 ¶ 9). The relevant question, however, is whether R-G Premier Bank offered or promised to extend an additional loan to Cerromonte. Even if R-G Premier Bank ultimately chose to extend the

maturity date of Cerromonte's existing loan, said fact would not establish that it also extended or promised to extend additional financing to Cerromonte.

Ultimately, although defendant has submitted evidence that R-G Premier Bank considered the possibility of extending additional financing to Cerromonte, (see D.E. 134-1, at 1), no evidence has been presented to the court that R-G Premier Bank either offered in fact to extend additional financing or prohibited—or attempted to prohibit—Cerromonte from seeking financing from another institution.  No evidence has been presented of any obstacle imposed by R-G Premier Bank to any attempt by Cerromonte to obtain additional financing from another institution.  Nor has any evidence been submitted of "a third party's higher offer," Black's Law Dictionary (9th ed. 2009), or "a bona fide offer from a third party," Bennett Veneer Factors, Inc., 73 Wash. 2d at 856, for purposes of R-G Premier Bank's right of first refusal.  There is also no material fact in controversy regarding the proposition that there was no written express promise that R-G Premier Bank would extend a second loan to Cerromonte to finance the construction of a shopping center.  As such, the doctrine of *exceptio non adimpleti contractus* is inapplicable in the instant case.

### B.      Modification of Liquidation Clause

In this case, the Mortgage Note contains a clause requiring, in the event that R-G Premier Bank were to initiate judicial proceedings against Cerromonte for the collection of the loan, the latter to pay $792,700 "as a liquidated amount, without necessity of further liquidation or approval by the Court to cover costs and expenses (including attorney's fees and expenses) of such foreclosure or judicial proceedings."  (D.E. 88-5).  "It is not necessary to allege damages under a penal clause," because "[t]he purpose of the penal clause is precisely to relieve the creditor from proving damages."  Consol. Mort. & Fin. Corp. v. Cooley, 3 P.R. Offic. Trans. 9, 14 (1974).  In other words, the purpose of a penal clause is "to eliminate all controversy" as to

18

"the amount of the damages" and "the existence of harm."   Id. (internal quotations omitted).

Under Puerto Rico law, "it is possible to agree upon obligations with penal clauses."   Rochester

Capital Leasing Corp. v. Williams Int'l Ltd., 3 P.R. Offic. Trans. 226 (1974) (citing P.R. Laws

Ann. tit. 31, § 3131).

      "Although art. 1106 of the Civil Code, 31 L.P.R.A. § 3131, states that in obligations with

a penal clause the penalty shall take the place of a compensation for damages and the payment of

interest in case of nonperformance, its aim is not always the advance liquidation of damages."

Jack's Beach Resort, Inc. v. Cia. Turismo, 12 P.R. Offic. Trans. 430, 436 (1982).   Rather, as its

name implies, a penal clause "fulfills a coercive and punitive purpose."   R.C. Leasing Corp. v.

Williams Int. Ltd., 3 P.R. Offic. Trans. 226, 234 (1974).   As such, a contractual evaluation of

damages in a penal clause "may exceed the actual measure of damage, so that this excess acts in

an efficacious manner as a pressure on the debtor to impel him to the specific performance of the

obligation before the threat of having to pay an indemnity which would exceed the pecuniary

equivalent of the obligation to which he is bound."   Id. at 235 (internal quotation omitted).

      The Puerto Rico Supreme Court has noted that "[i]n the North-American law there exists

a marked trend, with exceptions under certain circumstances, to invalidate the penal clauses."

R.C. Leasing Corp. v. Williams Int. Ltd., 3 P.R. Offic. Trans. 226, 232 (1974).   In contrast to the

American trend, "[t]he Civil Code of Spain … creates a very flexible structure for the treatment

of the penal clauses …."   Id. at 235.   Under the Civil Code of Puerto Rico, a court "shall

equitably modify the penalty if the principal obligation should have been partly or irregularly

fulfilled by the debtor."   P.R. Laws Ann. tit. 31, § 3133.   Such an equitable modification "must

be arrived at only in extraordinary circumstances as a means of mitigating its excessive

onerousness for the obligee, or the alarming lack of proportion."   Jack's Beach Resort, 12 P.R.

Offic. Trans. at 438.  This remedy is reserved for "extremely harsh circumstances."  Id.  In other words, "penalty clauses are enforceable unless they are found to be grossly unreasonable …." Tardanico v. Murphy, 983 F. Supp. 303, 309 (D.P.R. 1997) (citing Gil v. C.R.U.V., 9 P.R. Offic. Trans. 731 (1980)).

"[T]he burden of demonstrating lack of proportion between the breach and the penalty [is] on the debtor."  In re Álvarez, 473 B.R. 853, 863 (B.A.P. 1st Cir. 2012).  A sufficient showing of onerousness was made in Álvarez.  The debtor "argued that if upheld, a penalty of this magnitude would jeopardize her chances of success in chapter 13, thereby satisfying the element of onerousness required to justify moderation of a penal clause."  473 B.R. at 863.  The bankruptcy court "found that the Debtor had partly fulfilled her obligations under the Note since January 2004, and that although she had not made any payments to RNPM for over a year, the Debtor intended to cure the arrearage through the Plan," while "consider[ing] the Debtor's financial condition and the potential impact of the Penalty Clause when it adjusted the amount of the penalty."  Id.  The creditor's collection efforts ceased around the time of the filing of the complaint.  Moreover, the court "noted that the [debtor's chapter 13 plan] contemplated curing the Mortgage arrearage and monthly mortgage payments in the amount of $491.00."  Id.  In other words, the bankruptcy was placed in a position "to strike the necessary balance between the penalty and the magnitude of harm to [the creditor]."  Id. at 863–64.

The primary focus of defendant's arguments is that $792,700 is a "grossly exaggerated" amount for attorney's fees, and that "the FDIC … has not shown a single fact of any actual damages."  (D.E. 102, at 10).  As discussed earlier, however, the mere fact that there is a disparity between actual damages and the penalty is not sufficient to merit a reduction, as "the threat of having to pay an indemnity which would exceed the pecuniary equivalent of the

obligation to which [a debtor] is bound" is a permissible attribute of a penal clause.  R.C. Leasing Corp., 3 P.R. Offic. Trans. at 234.   Moreover, it is not even "necessary to allege damages under a penal clause," as the very purpose of such a clause is "to eliminate all controversy to that respect." Cooley, 3 P.R. Offic. Trans. at 14.

Unlike in Álvarez, Cerromonte has made no showing that the payment of $792,700— 10% of the principal amount—would be onerous or even particularly injurious in any way. Compare R.C. Leasing Corp., 3 P.R. Offic. Trans. at 236 (upholding trial court's refusal to reduce penalty which was equivalent to 15% of the principal where lessee failed to provide evidence of hardship), with Jack's Beach Resort, 12 P.R. Offic. Trans. at 439–41 (reducing penalty which was equivalent to 10% of the principal upon a showing of "conditions of oppression, lack of proportion in the penalty, and … extremely unfair consequences"); see also Levitt & Sons of P.R., Inc. v. D.A.C.O., 5 P.R. Offic. Trans. 248, 261 (1976) (reversing trial court's reduction of 2% penalty because said penalty "ke[pt] a just proportion with the foreseeable damages caused by the nonfulfilment, without imposing a punitive onerous burden"). Thus, defendant has not established "the element of onerousness required to justify moderation of a penal clause." Álvarez, 473 B.R. at 863.  Like defendant in this case, the debtor in Cooley failed to provide evidence of harm to it as a result of the penal clause.  See Cooley, 3 P.R. Offic. Trans. at 14 (noting that the debtor did not provide any evidence "of the effect this clause has on the financing of the housing units, the form in which the costs increase, the practices and prevailing usage in the industry, [or] how it prevents or aggravates the promotion of the public policy in facilitating the financing for the economic construction of housing units").  As such, the Puerto Rico Supreme Court held that, "[a]s to the penal clause, [defendant] has not placed us in condition of considering [its] objections thereto." Id.

Defendant also cites <u>Jack's Beach Resort</u> in support of its argument that the fees in this case would "promote windfall profits equivalent to unregulated taxation of corporate property." (D.E. 102, at 10).   In <u>Jack's Beach Resort</u>, the creditor "managed to rescind a twenty-year contract in three years, … released itself from the restriction imposed on its capital by an interest agreement that is unfavorable when compared with the going rate, … retained the money of the 32 installments paid by buyer Tourism, and the $332,741.68 of interest that was improperly paid due to an error of law before the Treasury Department's granting of tax-exempt status, and … activated the additional penalty of $320,000 for attorney's fees."  12 P.R. Offic. Trans. at 439–40.   In particular, the Puerto Rico Supreme Court focused on the low degree of fault on the part of the debtor, contrasting the "oppressi[ve]" penalty with the mere "nine-day delay on the part of the mortgagor in the payment of one installment."  <u>Id.</u> at 440.   Here, however, it is uncontested that Cerromonte has failed to pay plaintiff the principal sum of $7,350,824.44, the amount as of September 15, 2012, not including interest, fees, or the penalty.  (D.E. 88-2, ¶ 15; D.E. 102-1, at 4 ¶ 15).   Except for an up-front payment of $500,000, Cerromonte has made no contention that it has been partly or irregularly fulfilling its obligations as required by § 3133.   This is in marked contrast to the miniscule nine-day delay on one monthly payment over the course of twenty years in <u>Jack's Beach Resort</u>.   <u>See</u> 12 P.R. Offic. Trans. at 433.

Modification of a penal clause under § 3133 is an equitable remedy reserved only for "extraordinary" or "extremely harsh circumstances."   <u>Jack's Beach Resort</u>, 12 P.R. Offic. Trans. at 438.   "The juridical power of mitigation should be used only with great caution and notorious justification."   <u>Id.</u>   Without a showing by defendant of the onerous harm this clause will have on it, it is recommended that there be no reduction of the amount set forth in the penal clause.

**IV.    CONCLUSION**

Because there are no material facts in controversy that would lead to the applicability of the *exceptio non adimpleti contractus* doctrine in this case, and defendant has not established that the contractual penal clause should be modified under P.R. Laws Ann. tit. 31, § 3133, it is hereby recommended that plaintiff's motion for partial summary judgment (D.E. 88) be **GRANTED**.

**IT IS SO RECOMMENDED.**

The parties have fourteen (14) days to file any objections to this report and recommendation. Failure to file same within the specified time waives the right to appeal this report and recommendation. Fed. R. Civ. P. 72(b)(2); Fed. R. Civ. P. 6(c)(1)(B); Local Rule 72(d); see also 28 U.S.C. § 636(b)(1); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); United States v. Valencia, 792 F.2d 4 (1st Cir. 1986).

In San Juan, Puerto Rico, this 29th day of May, 2013.

s/Marcos E. López
U.S. Magistrate Judge